# ROBERT ABELES, Appellant, v. E. M. PILLMAN.

## Division Two, July 14, 1914.

1. **LIMITATIONS: Thirty-one Year Statute: Lawful Possession: Color of Title.** It is not reasonable to presume the defendant, who interposed the thirty-one year Statute of Limitations, held possession in good faith under a deed to her devisor concerning which the evidence does not show she had knowledge; and the trial court's finding that said defendant gained lawful possession from such deed was accordingly erroneous.

2. ————: ————: ————: ————: **Ownership.** The term "lawful possession" used in the thirty-one year Statute of Limitations (R. S. 1909, sec. 1884) does not mean possession based upon ownership of the title to the land—this for the reason that the statute contemplates that the "lawful ·possession" shall continue for a year after the thirty-year period before the one so having lawful possession becomes *ipso facto* vested with the title of the claimant. It therefore follows that the person in lawful possession must .be some one other than the owner.

3. ————: ————: ————: **What is.** Color of title is not necessary to establish "lawful possession" under the thirty-one year Statute of Limitations.

4. ————: ————: ————: **Special Findings: New Trial.** Where in ejectment the defendant asserted title to land under the thirty-one year Statute of Limitations, and the court found specially that, since he had color of title, said defendant was in "lawful possession," but it appears upon appeal that the evidence does not support the finding of color of title, the case is reversed and remanded for a new trial, in the course of which evidence may be introduced upon the question whether or not defendant's possession was of such character as to be lawful, under the statute, without color of title.

5. ————: ————: ————: **No Assessment of Taxes: Non-resident Owner.** Where a defendant in ejectment asserts title to the land under the thirty-one year Statute of Limitations (R. S. 1909, sec. 1884), one requirement of which is that neither the plaintiff nor those under whom he claims shall have paid any taxes on the land for thirty years, the plaintiff will not be excused, no taxes having been paid, by a showing that the record owner was not a resident of the State and that the land was never assessed for taxes, said owner having testified that he had made no inquiry about the land and thought it worthless.

Appeal fom St. Louis County Circuit Court.—*Hon. G. A. Wurdeman,* Judge.

REVERSED AND REMANDED.

*Andrew M. Sullivan* and *C. C. Bland* for appellant.

(1) If the deed from Greeley to L. F. Pillman is a forgery, as the trial judge found it to be, then the defendant by reason of her mutual relationship to L. F. Pillman, in respect to the lands, is, as would have been her devisor if he had been defendant in her stead, estopped to assert title in or lawful possession of the lands by virtue of the forged deed. Day v. Graham, 97 Mo. 398; Henderson v. Henderson, 13 Mo. 151; Tratam v. Rogers, 34 N. Y. Supp. 836; Crispen v. Hannavan, 50 Mo. 415; Subway Co. v. St. Louis, 140 Mo. 551; Henry v. Woods, 77 Mo. 271; Mygall v. Coe, 124 N. Y. 212; Tiedeman on Real Property, sec. 731, p. 690; Boniti v. Brown, 69 S. E. (N. C.) 614. (2) The defendant is not a bona-fide purchaser, but a mere volunteer, and her possession is not lawful within the meaning of the thirty-year Statute of Limitations. Young v. Scofield, 132 Mo. 650; Day v. Graham, 97 Mo. 398; Jones v. Sanders, 87 Mo. 557; Abraham v. Bender, 44 Mo. 560; Henry v. Wood, 77 Mo. 581. (3) If L. F. Pillman intended to claim the land or its possession under the forged deed, then his possession was fraudulent and unlawful. If he did not claim under the forged deed, his possession was that of a mere intruder or trespasser, and was unlawful. Searl v. School District, 133 U. S. 553; Mansfield v. Ballard, 74 Mo. 185; Collins v. Pease, 146 Mo. 135; Long v. Coal & Iron Co., 233 Mo. 740. (4) The failure of the proper officials to assess and levy taxes on the lands furnishes a non-resident owner of such lands a valid excuse for the non-payment of

taxes thereon, and Sec. 1884, R. S. 1909, does not apply. Harper v. Meyer, 117 Cal. 60; Dressner v. Nelson, 138 Cal. 394; Swank v. Irrigation & Power Co., 15 Idaho, 353; Weisner v. Chamberlain, 117 Ill. 56; Railroad v. Forsyth, 118 Ill. 277.

*John A. Watson* and *A. E. L. Gardner* for respondent; *Perry S. Rader* and *E. P. Mann* of counsel.

(1) Defendant's possession was lawful for one whole year after the expiration of the thirty-year period during which Greeley paid no taxes nor was in possession. Collins v. Pease, 146 Mo. 139; Shumate v. Snyder, 140 Mo. 84; Swope v. Ward, 185 Mo. 316. Under the ten-year Statute of Limitations, actual adverse possession for ten consecutive years, under a claim of ownership, makes the possession lawful, and vests the title in the possessor, even though he was originally a mere intruder or trespasser. Humbert v. Trinity Church, 24 Wend. (N. Y.) 604; Smith v. McCorkle, 105 Mo. 141; Craig v. Cartwright, 65 Tex. 424; Link v. Bland, 43 Tex. Civ. App. 520; Wood v. Railroad, 11 Kan. 324; Quick v. Rufe, 164 Mo. 412; Mather v. Walsh, 107 Mo. 132; Franklin v. Cunningham, 187 Mo. 196; Scannell v. Soda Fountain Co., 161 Mo. 618; Warren v. Bowdran, 156 Mass. 280. Accepting as correct the definition of "lawful possession" as given in Collins v. Pease, 146 Mo. 139, namely, that "one is in 'lawful possession' within the meaning of the act [Sec. 1884] when he has not entered as a mere intruder or trespasser, but in good faith, claiming to be the owner," then defendant was unquestionably in lawful possession, not only for one year after the expiration of the thirty-year period, but for more than six years. She did "not enter" upon the land "as a mere intruder or trespasser." Her husband had been in possession for eighteen years, claiming to be the owner, and she testifies that "he owned it" and

her son Fred that "he always claimed to own it." He
was in possession when he died, and by his will he
devised the land to her, and she continued without
interruption the possession he had and enlarged it by
erecting the sand screen. She honestly believed he
was the owner, and that in consequence by his will
she had become the owner. She did not, therefore,
enter "as a mere intruder or trespasser." And she
began and continued in possession "in good faith,
claiming to be the owner." He had been in possession,
claiming to be the owner, for eighteen years, and for
at least five years his possession had been peaceable
and undisputed by any one. She thought his will
gave her a right to continue his possession and to
claim to be the owner, and in that belief, honestly and
in good faith, she maintained possession for more than
six years, continuing to buy and stack ties on the land,
and to move sand and gravel from it, and built a sand
screen house, and paid taxes on what she thought was
the land, which of itself was evidence of claim of own-
ership. Her possession, therefore, was "lawful,"
and it was for more than one year after the thirty-
year period had expired. Certainly these facts are
substantial enough to justify the trial court, sitting
as a jury, to find, as a fact, that defendant's posses-
sion was lawful. (2) This court has never held that
to constitute lawful possession color of title in the
possessor is necessary. We have examined, one by
one, every case in which title was claimed under sec-
tion 1884, and in not one of them was it said that color
of title is necessary as a basis for "lawful possession."
Those cases are as follows: Dunnington v. Hudson,
217 Mo. 93; Campbell v. Greer, 209 Mo. 199; Haar-
stick v. Gabriel, 200 Mo. 243; DeHarte v. Edmonds,
200 Mo. 246; Crain v. Peterman, 200 Mo. 295; Collins
v. Pease, 146 Mo. 135; Fairbanks v. Long, 91 Mo. 628;
Mansfield v. Pollock, 74 Mo. 185; Rollins v. McIntire,
87 Mo. 497; Shumate v. Snyder, 140 Mo. 77; Howell

v. Jump, 140 Mo. 442; Pharis v. Bayless, 122 Mo. 116; Weir v. Lumber Co., 186 Mo. 392; Chilton v. Comonianni, 221 Mo. 685; Long v. Coal and Iron Co., 233 Mo. 727; Cousins v. White, 246 Mo. 307.

WILLIAMS, C.—This is a suit in ejectment to recover possession of two irregular strips of land lying in the southwest fractional quarter of section 13, township 37, range 10, west, Phelps county, Missouri. The suit originated in the Phelps County Circuit Court but upon change of venue was sent to the circuit court of St. Louis county where trial was had before the court without a jury, resulting in a judgment for the defendant. The petition was in the usual form. The answer contained a general denial but admitted that the defendant was in possession of the land. The answer also pleaded the ten-year and the thirty-one year Statutes of Limitations. The reply put in issue the pleas of the Statutes of Limitations, admitted that neither plaintiff nor those under whom he claimed had paid any taxes on the land, but alleged as an excuse therefor that the land had never been assessed for taxation. The land in question lies between the eastern city limits of the town of Jerome and the Gasconade River. The two strips are separated by the right of way of the St. Louis & San Francisco Railroad, which runs north and south. One of the strips of land adjoins the railroad's right of way on the west and lies between the right of way and the Main street in Jerome and is referred to as the "tie yard." The other strip lies east of the railroad right of way and extends from the right of way to the west bank of the Gasconade river. The two strips of land are approximately two thousand feet long. The tie yard strip varies in width from ninety to one hundred and fifty feet, the river strip is about three hundred feet wide for half way of its length, then it narrows down abruptly to a few feet in width.

In 1866, one William F. Greeley made a cash entry of the quarter section in which the land in question is located and on August 15, 1870, received a patent therefor. During the years of 1867 and 1868 said Greeley conveyed the above mentioned right of way to the railroad company and conveyed about six acres of the quarter section to a mill company and on the western portion of the quarter section estab- lished the town of Jerome, making a plat thereof showing the blocks, lots, streets and alleys. This left undisposed of the two strips of land now in contro- versy. On March 26, 1910, said Greeley, by a quit- claim deed, conveyed all of his right, title and interest in and to the land now in controversy to the plaintiff herein, and a short time thereafter this suit was in- stituted. Plaintiff introduced in evidence the patent from the United States to William F. Greeley and the above mentioned quitclaim deed from said Greeley to the plaintiff herein, and offered evidence tending to show that the monthly rents and profits of the two strips of land were about seventy-five dollars. The evidence on the part of the defendant tended to show that she was the widow of Louis F. Pillman, deceased; that her husband died in December, 1903, leaving a will whereby be devised to defendant, for life, all his real estate. The will does not attempt to describe any of testator's real estate. In 1883, said Louis F. Pillman became a resident of the town of Arlington, which is on the east side of the Gasconade River and about one-half mile from the town of Jerome. From the time said Pillman moved to Arlington until his death in 1903, with the exception of two or three years beginning with 1889 and a further period of about one year beginning about 1896, he was engaged in dealing in railroad ties and the shipping of sand and gravel both at Arlington and at Jerome. The ties which he purchased would be floated down the Gasconade River in rafts and would be landed on the river strip where

they would be taken by said Pillman and hauled across the river strip and on to the west strip known as the tie yard. These ties would be stacked upon the tie yard strip until they were inspected by the railroad inspector and then they would be placed upon cars and shipped out. At times the tie yard strip would be practically covered with ties and at other times only a few culls would be located thereon. The number of ties handled varied in number from one hundred thousand to two hundred thousand per year. During this time said Pillman loaded sand from the river strip. The sand would be deposited on the river strip about once a year, during high water, and then Pillman would haul sand away until the supply was exhausted and would then wait until another deposit was made before moving more sand. During the time said Pullman continued the sand and tie business he exercised exclusive rights of ownership over the two strips of ground, denying to others the right to use the same. Defendant's evidence also tends to show that during the time that Pillman continued the tie and sand business on this ground he claimed to own the ground. Defendant offered in evidence an instrument purporting to be a quitclaim deed conveying the land here in controversy to L. F. Pillman, executed and acknowledged by ''William F. Greely'' at the city of St. Louis, January 12, 1903, and recorded in Phelps county, Missouri, August 10, 1909 (the evidence tends to show, and the court found, that this deed was a forgery). The evidence tends to show that four or five years after the death of said L. F. Pillman this deed was either handed or mailed, by deceased's attorney, to John H. Pillman, a son of defendant, and L. F. Pillman, the grantee named in said deed. It appears that at the time of L. F. Pillman's death said attorney was attending to his legal business, and at the time of Pillman's death had possession of his will and some other documents belonging to said Pillman.

J. H. Pillman, the person who received from the attorney the above mentioned deed, had never heard of the deed prior to its delivery to him.  Upon receiving the deeds, said J. H. Pillman had the same placed of record.  The record does not disclose how the attorney got possession of the deed, neither is there any direct evidence that said Pillman, the grantee in said deed, had ever had possession of the deed or knew of it.  Defendant testified that her husband used this land all the time that he was in the sand and tie business; that he hauled gravel and sand from the river strip and hauled the ties from the river, across the river strip, and piled them upon the tie yard strip; that she never heard anyone else claim to own the land during all the time they were there and that no one else was in possession of or used or claimed to own the land during any of the time that her husband occupied it.  Upon cross-examination, she testified her son, Fred, since the death of her husband, looked after her business and she did not know whether any taxes had been paid on the land or not and that she did not know whether her husband ever paid any taxes on the land or not.  The following occurred during her cross-examination:  "Q.  Did you ever know W. F. Greeley?  A.  No, sir.  Q.  You say you never heard of Greeley; I will ask you if after your husband's death you found a quitclaim deed purporting to be from W. F. Greeley to your husband for this strip of land, dated about January 12, 1903?  A.  I don't remember of any of that kind; I don't look after things of that kind."

After the death of defendant's husband, defendant's two sons, with her consent, continued to occupy the land and carried on the tie and sand business thereon in very much the same manner as it was conducted prior to their father's death.  Defendant's possession, in this manner, was continued up until the time that this suit was instituted.  The land was never fenced nor improved in any manner excepting that,

about two years prior to the institution of this suit, defendant's two sons built a sand screen, costing about fourteen hundred dollars, on the tie-yard strip.

The deposition of William F. Greeley was taken in the city of Boston, Massachusetts, on April 20, 1910. The cross-examination contained in this deposition was offered in evidence by defendant and the direct examination was offered in evidence by the plaintiff. Greeley testified that, at the time of the taking of his deposition, he was seventy-nine years old; that in 1865 he was an army officer in the regular army of the United States, stationed in Springfield, Missouri, as a mustering officer, mustering out troops at the close of the war; that he resigned in May, 1865, and located at Rolla, Missouri, where he engaged in business; that about 1867 he made an entry of the quarter sec tion of land on the Gasconade River and laid out the town of Jerome; that he lived in Jerome for a time and left there in the fall of 1869; that he never resided in Phelps county, Missouri, after 1869; that he never paid any taxes on the land and did not know who had had possession of the land; that he never did anything with the land after 1869, other than to make the quitclaim deed to plaintiff in 1910; that after leaving Phelps county, Missouri, he went to Marshfield, Missouri, and from there to Wichita, Kansas, where he remained about two years, and then to St. Louis where he remained about six months; that he first went to Boston to reside in 1880, but did not live there continuously; that in 1900 he returned to Boston and had lived there since that time and had not been out of New England since 1900; that he was not in St. Louis in 1903 and was not acquainted with L. F. Pillman and did not make the deed to L. F. Pillman in 1903 or any other time; that he executed the quitclaim deed to plaintiff for a consideration of one hundred dollars; that in 1910 an attorney called on him and asked him if he would make a quitclaim deed to the interest

that he owned in the land in question; that he did not want to make a warranty deed because he did not know whether the land had been sold for taxes or not; that he had known for forty years that he owned the property in Phelps County, Missouri, but never thought enough about it to have the taxes paid on it and "didn't think it was worth five cents."

Plaintiff's evidence in rebuttal tended to show that during the time that Pillman was engaged in the sand and tie business at Jerome, he did not claim to own the land. One witness testified that about sixteen years ago he heard Pillman say that he would like to own the land and another witness testified that Pillman claimed that he had a lease on the land. The clerk of the county court of Phelps county testified that he had recently made an examination of the old tax books to ascertain whether or not this land had ever been assessed for taxation. He testified that the two strips never appeared upon the tax books by their exact descriptions. He found that in 1879 and 1880 the fractional east half of the southwest quarter was assessed to Milton Santee (the two strips in controversy are embraced within the east half of said quarter section). In the year 1881, sixty-eight and eighty-nine one-hundredths acres of the east half of said quarter section were assessed as unknown. In 1882, forty-eight and eighty-nine one-hundredths acres of the fractional east half of said quarter section were assessed to Milton Santee and fifty-six acres of the east part of said quarter section were assessed to James Carney. In 1883, forty-eight and eighty-nine one-hundredths acres of the fractional east half of this quarter section were assessed to Milton Santee. In 1885, 1886 and 1887, fifty-eight and eighty-nine one hundredths acres of the fractional east half of this quarter section were assessed to Milton Santee. In 1905, four acres (undescribed) of this quarter section and west of the Gasconade River were assessed in the

name of, and the taxes paid by, this defendant. In the years 1906 and 1907, apparently the same four acres were assessed in the name of James Carney and the taxes paid by this defendant. For the years 1908 and 1909, said four acres were assessed to defendant and the taxes were paid by her and these four acres were assessed to defendant in 1910. This witness also testified that William F. Greeley had never paid any taxes on any portion of this quarter section of land. The court made a finding of facts in which it found that the land in question was patented to one William F. Greeley and that on March 26, 1910, said Greeley executed a quitclaim deed purporting to convey said land to the plaintiff herein; that said Greeley never paid any taxes on said land and that none were ever levied thereon; that the rental value of the land is $75 per month; that while L. F. Pillman occupied said land he absolutely prevented others from using it and to some persons he claimed he owned the land and to others he claimed that he had the yard leased; that said Greeley never appeared at Jerome or made any claim to said land since 1870, and that defendant was in possession of the land at the time this suit was brought and has been in said possession since the death of her husband, who died testate, leaving defendant as his beneficiary, in 1903; that the quitclaim deed, dated January 12, 1903, purporting to be executed by William F. Greeley to L. F. Pillman, was a forgery; that the possession of said land by deceased Pillman was not hostile nor adverse to the title of said Greeley and was therefore not sufficient to invoke the ten-year Statute of Limitations. The court found, however, that the defendant was entitled to invoke the thirty-one year Statute of Limitations and in support of that defense found the following facts: That Greeley never had the actual possession of the land at any time and never paid any

261Mo24

taxes thereon; that plaintiff failed to bring his action within one year after the thirty-year period, in which plaintiff and those under whom he claims were out of possession; and that the title had emanated from the Government more than ten years prior to the commencement of this suit. The court intimates that the close question in the case is whether or not the defendant was in "lawful possession," at any time, for one year after the termination of the thirty-year period. With reference to that point the court makes the following finding of facts:

"The petition alleges that she was in possession at the date of the institution of this suit, and the possession she held that date was the possession of the date when the forged deed to her deceased husband was put on record. And now arises the only decisive question in the case. Was the possession of the defendant in this forged deed sufficient to make her possession lawful? There is no doubt that defendant and her son believed the deed to their ancestor to be a proper, valid and genuine deed, otherwise they would have been slow to put it upon record. It is clear that thereupon the defendant held possession under a deed that she thought was genuine, but was in fact a forgery. 'Generally it may be said that any writing which purports to convey the title to land by appropriate words of transfer, and describes the land, is color of title, though the writing is invalid, *actually void* and conveys no title.' [Dunnington v. Hudson, 217 Mo. l. c. 100.]

"Of course, this deed conveyed nothing and no interest in the land was acquired by it, but being recorded by the defendant and the land held by her under it, in good faith, for several years before the institution of this case, she, in my opinion, had sufficient color of title to warrant her possession to be 'lawful,' and for the reasons above set forth the judgment will be for the defendant."

The court thereupon rendered judgment, finding the issues for the defendant, and the plaintiff perfected an appeal to this court.

The court found in favor of appellant and against the claim of respondent with reference to the defense that plaintiff's action was barred by the ten-year Statute of Limitations. The question as to the bar of the ten-year Statute of Limitations need not therefore be here discussed.

The court found for defendant on the theory that plaintiff's cause of action was barred by the thirty-one-year Statute of Limitations (Sec. 1884, R. S. 1909), and it is with reference to points urged by appellant against the action of the court in this regard that the appellate review is concerned.

I. With reference to the defense of the thirty-one-year Statute of Limitations, the court found the

**Limitations: Thirty-one Year Statute: Color of Title: Evidence.** following facts: (1) That neither plaintiff nor those under whom he claimed had been in the actual possession of the land or paid any taxes thereon at any time since 1870 (which was more than thirty-one years before the commencement of this suit); (2) that the title had emanated from the Government more than ten years; (3) that plaintiff failed to bring his action within the thirty-first year. There was substantial evidence to support the foregoing finding of facts. But in order that the defense of said Statute of Limitations might be available to defendant, it was necessary that one additional fact be found, to-wit, that after the expiration of said above mentioned thirty-year period and before the institution of this suit, defendant must have been in the *lawful possession* of said land for one year. [Fairbanks v. Long,

91 Mo. 628, l. c. 633; Collins v. Pease, 146 Mo. 135, l. c. 140.] The question as to whether defendant had been in *lawful possession* for one year is, as declared by the trial court and shown by the record, the most important question in the case. In this regard, the court found that defendant held possession under the forged deed from said Greeley to her deceased husband; that defendant believed this deed to be a valid and genuine deed and that she in good faith held under said deed for several years before the institution of this suit, and that said deed constituted color of title and made her possession lawful within the meaning of said statute. Appellant contends that the court erred in the above finding of facts and in the conclusion of law with reference to said deed constituting color of title. We have very carefully examined the evidence and agree with appellant's contention that the court erred in the above finding of facts for the following reasons: The evidence fails to show that defendant ever claimed under or by virtue of said forged deed. The evidence shows that whatever possession defendant held, was entered into by her a short time after her husband's death. The deed was not discovered until four or five years after the death of her husband, when it was given by an attorney to defendant's son and by him filed for record and so far as the evidence shows without her knowledge. Defendant testified that she did not remember anything about the deed, and there was no evidence to show that she ever heard of the deed until after this suit was instituted. The son who received the deed from the attorney was named one of the devisees of the remainder interest in testator's real estate and for aught that appears in the testimony he was acting for himself when he had the deed recorded. It is not reasonable to presume that defendant claimed or held possession in good faith under a deed about which she had no knowledge. That being true, the finding

of fact by the court that she, in good faith, claimed
under and held possession by virtue of said deed as
color of title was erroneous because there is no evi-
dence to support said finding.   In determining the
character of *her* possession therefore the situation
must be viewed as though the forged deed had never
been in existence, and it is therefore unnecessary to
a decision of the case to determine what effect, if any,
said forged deed would have as color of title had the
evidence shown that she in good faith claimed and
held possession under or by virtue of the same.

II.   Appellant contends that "lawful possession"
as used in said statute cannot exist in the absence of
color of title in the possessor.   Re-
spondent contends that the possessor
need not claim under color of title.   This
necessitates a discussion of the term "lawful posses-
sion" as used in said Statute of Limitations.   The
statute is as follows:

*Lawful Possession: Color of Title.*

"Sec. 1884.   Limitation in case of certain titles.
Whenever any real estate, the equitable title to which
shall have emanated from the government more than
ten years, shall thereafter, on any date, be in the law-
ful possession of any person, and which shall or might
be claimed by another, and which shall not at such
date have been in possession of the said person claim-
ing or who might claim the same, or of any one under
whom he claims or might claim, for thirty consecutive
years, and on which neither the said person claiming
or who might claim the same nor those under whom
he claims or might claim has paid any taxes for all
that period of time, the said person claiming or who
might claim such real estate shall, within one year
from said date, bring his action to recover the same,
and in default thereof he shall be forever barred, and
his right and title shall, *ipso facto,* vest in such pos-
sessor: *Provided, however,* that in all cases such

action may be brought at any time within one year from the date at which this section takes effect and goes into force.''

It becomes at once apparent that the term ''lawful possession'' as used in the statute does not mean possession based upon ownership of the title to the land—this for the reason that the statute contemplates that the ''lawful possession'' shall continue for a year after the thirty-year period (Fairbanks v. Long, supra; Collins v. Pease, supra) before the one so having lawful possession becomes *ipso facto* vested with the title of the claimant. It therefore follows that the person in ''lawful possession'' must be some one other than the owner.

In the case of Collins v. Pease, 146 Mo. 135, WILLIAMS, J., in discussing the question said: ''One is in 'lawful possession' within the meaning of the act when he has not entered as a mere intruder or trespasser, but in good faith, claiming to be the owner.'' In the foregoing definition the phrase ''a mere intruder or trespasser'' is evidently used as synonymous with the opposite meaning of the phrase ''(one who enters) in good faith, claiming to be the owner'' and therefore means a person entering into possession when he does not in good faith believe himself to be the owner. So that the definition announced in the case of Collins v. Pease, supra, when reduced to its last analysis simply means that one is in the lawful possession within the meaning of said statute when he enters into possession claiming to own the same and in good faith believing that he is the owner. Is then color of title a prerequisite to the lawful possession? It is true that in perhaps all the cases involving the application of this statute, the possession was claimed under color of title. This is quite naturally so since the great majority of persons who go into possession of land in good faith claiming to own the same do so under a deed or instrument purport-

ing to convey the title. But while this is true, we are not aware that it has ever been expressly held in any of those cases that lawful possession could not exist in the absence of color of title in the possessor.

"The term [color of title] implies that a valid title has not passed." [1 R. C. L. 707.]

In cases of this kind, color of title at most could be nothing more than the *evidential basis* of good faith, or *evidence* from which good faith might be presumed or inferred or the territorial extent of the possession ascertained. The rule announced in the case of Collins v. Pease, supra, only states the ultimate facts which must be proved, e. g., possession in good faith under claim of ownership, and does not in any manner limit the proof by which those ultimate facts may be shown. No reason appears why the ultimate fact should be proved in any particular way or by any special brand of evidence, and it therefore follows that those facts may be shown by any competent evidence possessing the necessary probative force or value. Respondent in her brief contends that the evidence does show that defendant in good faith entered into possession of this land claiming to own the same. as devisee under her husband's will; that she believed her husband to be the owner of the land, and that she became the owner of a life estate in said land as devisee under the will, and that so believing and claiming she entered into the possession of the same upon the death of her husband and continued in such possession until this suit was instituted and was therefore in the lawful possession of the land for more than one year after the said thirty-year period and before the institution of this suit. There was evidence tending to support the above claim of respondent, but the evidence is not uncontradicted. There was a conflict in the evidence as to whether defendant's husband claimed to own the land. There is also conflict in the evidence as to the extent of her

actual possession, if color of title is absent. This being an action at law, it was the peculiar function of the jury, or the trial court sitting as a jury, to find the facts. "It was the province of the trial court sitting as a jury to weigh the evidence and determine the real facts of the matter. This duty this court cannot usurp." [Slicer v. Owens, 241 Mo. 319, l. c. 323.] This is not a case where the trial court found the issues generally for the defendant, and where

Special Findings.

there being sufficient evidence to justify said general finding, we would presume that he found the necessary facts upon which to base the judgment. Here the record shows the specific facts found by the court, which, as above stated, were unsupported by the evidence. The court made no finding of facts upon the theory now advanced by respondent. Appellant is entitled to have these issues of fact passed upon and determined by the trial court, and hence the case must necessarily be reversed and remanded for new trial. It is impossible to foresee what the evidence will be upon retrial, and therefore it would serve no useful purpose to discuss the weight and effect of the present evidence, as showing good faith, extent of possession, etc. We would suggest, however, that the present evidence is not very definite with reference to the exact extent or limits of the defendant's possession if she is not to be aided in that regard by constructive possession arising out of a claim under color of title, as provided by section 1882, Revised Statutes 1909.

III. Appellant further contends that the land was never assessed for taxes and that since the record

No Assessment of Taxes: Non-resident Owner.

owner was a non-resident of the State this excused the non-payment of taxes. It will be noticed that the statute makes no exception in this regard. All the showing that the statute requires in this regard is that

neither the claimant nor those under whom he claims or might claim have paid any taxes for thirty years. This was shown in the present case. Whether or not an excuse might arise if it should appear that the claimant or those under whom he claims, after some effort upon their part and by matters over which they had no control, were prevented from making payment of taxes because none were assessed, we need not now determine, because such a situation is not here involved and it would indeed be a rare occasion where the owner would have any difficulty in having his land assessed after calling it to the attention of the proper officials.

Here the person who owned the title during all the thirty-year period testified that he did not care enough about the land to even make any inquiry about it, and that he did not undertake to pay any taxes on the land because he thought the land was not worth "five cents." Under such conditions the failure of the officials to properly assess the land should not operate to exempt him or his granteee from the bar of the statute.

In support of his above contention appellant cites the following cases: Harvey v. Meyer, 117 Cal. 60; Dierssen v. Nelson, 138 Cal. 394; Swank v. S. I. & P. Co., 15 Idaho, 353; Wisner v. Chamberlin, 117 Ill. 568, and Peoria, D. & E. R. R. Co. v. Forsyth, 118 Ill. 272. But an examination of those authorities will disclose that they are based upon statutes which require that the party who claims title by adverse possession for the required statutory time must show that he has paid all taxes "which have been levied and assessed upon such land" or which have been "legally assessed" against such land during the time of his adverse possession. It is therefore apparent that the respective holdings in those cases would not be authorities in point in the present case.

For the reasons given in paragraphs one and two above the judgment is reversed and the cause remanded. *Roy, C.,* concurs in result.

PER CURIAM.—The foregoing opinion of WILLIAMS, C., is adopted as the opinion of the court.

*Walker, P. J.,* and *Brown, J.,* concur, *Faris, J.,* concurs in result.