N. Jessie CRANE, Appellant,

v.

A. B. LOY, Harold A. Batye, Opie Nichols, Claud A. Nichols, James A. Reeder, Marvin Thomas and Morris Hazzell, Individually and as Trustees of the Woodcrest Primitive Baptist Church, and as members and representatives of the members of the Woodcrest Primitive Baptist Church, and Cecil Bennett, Pastor of the Woodcrest Primitive Baptist Church, and as a representative of the members of said church, Respondents.

No. 53364.

Supreme Court of Missouri,
Division No. 2.

Dec. 31, 1968.

Motion for Rehearing or to Transfer to the Court En Banc Denied Feb. 10, 1969.

J. Robert Tull, James A. McGee, Columbia, for appellant.

Russell T. Keyes, Jefferson City, Ralph L. Alexander, Columbia, for respondents.

BARRETT, Commissioner.

On April 20, 1963, Mrs. N. Jessie Crane, alleging her paper record title to a strip of ground in Block 30, Ashland, instituted this suit to quiet title, for trespass and for damages. The defendants are the pastor, board of trustees and members of the Woodcrest Primitive Church who on July 1, 1961 purchased a tract of land adjoining Mrs. Crane's property from G. A. and Nelle W. John. In response to Mrs. Crane's suit the church pleaded title to the strip of land by adverse possession, under the ten-year statute (RSMo 1959, § 516.-010, V.A.M.S.), and asked for a decree quieting title in it. The trial court found all issues in favor of the church, found that Mrs. Crane had no interest in the strip and accordingly quieted title and Mrs. Crane has appealed.

Pointing to the evidence, for the most part that adduced by her, the appellant urges that the respondents' evidence is insufficient to support the claim and finding of the essential elements of adverse posses-sion as set forth in State ex rel. Edie v. Shain, 348 Mo. 119, 122, 152 S.W.2d 174, 176. Specifically, she claims that there is no showing of "open and notorious use" by the defendants' predecessors or proof that their use "was not in subordination of the true owner." In this connection it is urged that respondents failed to "show when limitations under the statute began to run against appellant." And, finally, because, it is said, the defendants' immediate predecessor in title, Mr. John, undertook to change the record 'title by asking his predecessor for a quitclaim deed, he admitted no title to the controverted strip in himself and by the same token admitted the existence of a paramount title in Mrs. Crane and "thus their (the respondents and their predecessors) possession was not hostile and adverse to appellant for the statutory period."

The subject matter of this litigation is a strip of land 60.5 feet wide at its east end and 80 feet wide at its west end across the south side of Block 30 in Ashland. Its demarcation on the north in 1966, when this suit was tried, is the remains of a woven wire east-west fence and its visible remaining east-west fence line. While, as stated, the record paper title is in Mrs. Crane, neither she nor her predecessors have ever been in actual possession of the fenced strip. The church and its predecessors have been in actual, obvious possession for more than twenty years. The church's predecessors farmed the strip as a part of its adjoining tract and after its purchase from Mr. John in 1961 the church constructed a gravel driveway and entrance to its parking area and new church on this strip of land.

The following is the history of the two tracts of land and the 60 by 80-foot strip and the relationship of the parties and their predecessors in title to it. The title of both of the immediate parties originated on the same day, May 22, 1915, with conveyances from Harley J. and Clarabel Sapp. The following is Mrs. Crane's chain of title: May 22, 1915, Harley J. and Clarabel Sapp to Thomas E. Whitfield, March 10, 1916,

Whitfield to *John D. Brinegar* (Emphasis supplied for later notation), and December 23, 1931, Brinegar to Morris and N. Jessie Crane. The following is the chain of title of the Woodcrest Primitive Baptist Church: May 22, 1915, Harley J. and Clarabel Sapp to *Ely L. Brinegar,* February 7, 1929, Brinegar to Lucy J. Carruth, December 31, 1935, Carruth to John and ·Alice Heyen, June 26, 1945, Heyen to A. L. and Ellen T. Selby, March 16, 1958, the Selbys through their administratrix, Ruth Pauley, to G. A. John, and on July 1, 1961, John and his wife to the respondent church. The conveyances in Mrs. Crane's chain described the property as Block 30, and the conveyances in the church's chain described the property as "Beginning at the Southeast corner of Block Thirty (30)" and "thence West along the South line of said Block Thirty (30)" but "all in Block Twenty-Nine (29)" and thus did not in terms include the strip in controversy here.

J. E. Brinegar, age 56, the son of the first grantee in the church's chain of title, testified that his father and his uncle owned the adjoining tracts. He said, "My dad bought half of the original tract." It was his testimony that his father and his uncle divided the tract, his uncle retaining the north half and his father the south half. And, he said, "We put the fence through." He said, "(w)e had a transit and we run it straight" with the fence, it was originally in on the other part of it. There were these specific questions and answers:

"Q. Did your father at one time own this land which the church now says is theirs?

"A. He owned it until he sold it.

"Q. Yes. And to whom did he sell it?

"A. Jim Carruth.

"Q. And did he own and claim to own between the fence lines?

"A. He owned between the fence lines. He did own between the fence lines.

"Q. Did he own everything between the fence lines?

"A. He certainly did.

"Q. And when he sold it to Mr. Carruth, did he sell everything between the fence lines?

"A. He did.

\*    \*    \*    \*    \*    \*

"A. My dad and I built the fence, right directly to that—I mean to that tree setting up there. (In the photographs.) That is the original tree that he set out after the fence was built.

"Q. And the fence continued along that same line ever since your father claimed to own it?

"A. My dad owned everything south of the fence.

"Q. And did your father and your uncle agree that this fence divided the two tracts?

"A. Right."

This witness was corroborated by his sister, Mrs. Bullard.

■ While not determinative of this appeal it should be interpolated that the Brinegar occupancy of the fenced area from 1915 to 1929, a period of fourteen years, was adverse in character. "Possession to an agreed line varying from the true line has been held in a considerable number of decisions to be adverse and, when maintained for the statutory limitation period, to pass title." Annotation 97 A.L.R. 14, 75; 3 Am.Jur.2d·(Adverse Possession) Sec. 43, p. 132. In the latter text there is this applicable sentence: "If a fence is constructed as a boundary line fence between two properties and if the parties concerned claim ownership of the land to the fence during the statutory period without interruption in their possession or control during that time, they will acquire title by adverse possession to any

land that was improperly inclosed with or added to the land they owned at the time the fence was constructed." Missouri cases applying this rule are Atchison v. Pease, 96 Mo. 566, 10 S.W. 159 and Railsback v. Bowers, Mo., 257 S.W. 119. In all these instances intention is the controlling factor: "Where the intention is to claim to the established line at all events, the intention with which the possession is taken and maintained is the controlling factor in determining its adverse character." 97 A.L. R. l.c. 53, and l.c. 39 citing 45 Missouri cases.

There were no descendant Carruth or Heyen witnesses, the occupants from 1929 to 1945. But G. A. John said that he had "known this tract of land since 1925." He had also personally known the owners and he said that their possession was well known and repeatedly he said, "this tract of land had been sold and resold that way for the last 40 or 50 years." In any event the successors in title to the Carruths and Heyens and the successors to their possession of the disputed strip were the Selbys, from January 26, 1945 to the sale to John on March 16, 1958, another period of thirteen years. During their tenure Mr. A. B. Bullard, age 76, said that as a tenant of the Selbys he farmed the area for six or eight years. It was his testimony that two or three years before Mr. Selby's death in 1948 he helped rebuild the fence. And positively he said that Mrs. Crane's husband, Morris, helped with the fence rebuilding. He testified that as the Selbys' tenant he farmed the tract "(f)rom fence to fence." But in this connection Mrs. Ruth Pauley, a peppery age 74 at the time of trial, was the most important witness. She was Ellen Selby's sister and as the administratrix of the Selby estate sold this piece of property to G. A. John. As to her and the immediate problem there were these questions and answers:

"Q. And do you know whether or not Mr. and Mrs. Selby claimed to own to the fence?

"A. Well, why wouldn't they; if it was on their side of the fence, why wouldn't they claim that to be theirs?

"Q. Well, then is your answer that they did claim it?

"A. Well, I'd say they did.

\* \* \* \* \* \*

"Q. And when you and your sisters inherited that property, did you claim to that fence line?

"A. Why yes, didn't know anything different, but what it belonged to that place."

Obviously, Mrs. Crane could not deny the fence, there was no gate in the fence permitting entry to her property—the gate to her land was north of the tree to which the east-west fence became attached. Neither could she deny the occupancy of the strip inside the fence by the Brinegars, the Carruths, the Heyens and the Selbys, nor even Mr. John, and she did not attempt to. She claimed that their occupancy was permissive, that she and Mr. Crane rented the land to tenant farmers. But in this she was all but overwhelmed, they all denied any rental agreement or connection whatever with the Cranes or that they had in any manner acknowledged their title to the enclosed strip. Mr. Bullard, to illustrate specifically, denied paying any rent, crop or cash, to the Cranes.

■ In these circumstances, from 1929 to 1958, 29 years, the 60 by 80-foot strip of land was occupied and held adversely by the respondents' predecessors in title and meets all the requirements of establishing title by adverse possession even before John acquired title and occupied the fenced area. The latest case in point on this phase of the cause is Miller v. Warner, Mo., 433 S.W.2d 259. Other relevant cases, to note only two out of numerous cases, are Tillman v. Hutcherson, 348 Mo. 473, 154 S.W. 2d 104 and Pioneer Cooperage Company v. Dillard, 332 Mo. 798, 59 S.W.2d 642; Moss

v. James, Mo., 411 S.W.2d 104 and the exhaustive annotation 80 A.L.R.2d 1171.

■ The effect of all this is that John's and respondents' predecessors acquired legal title to the fenced strip even though it was not mentioned in the conveyances. "His title originating in his wrongful possession becomes absolute by the extinguishment of the former owner's title. There is, of course, no transfer by operation of law or otherwise of the former owner's title. *A new title has arisen* simply and solely because of the wrongful possession *followed by the statutory extinguishment of the former title.* * * * When the period of the statute has run, the former owner's title is necessarily extinguished." 3 American Law of Property, Sec. 15.2, pp. 760, 762. In 5 Thompson, Real Property, Sec. 2541, pp. 507–510, the rule as to the effect of adverse possession for the statutory period is stated in this language: "Adverse possession for sufficient time to bar an action to recover real estate confers title, against any title whatsoever, as effectively as if the original owner had made a formal conveyance to the possessor. It operates as complete investiture of title. A title acquired by adverse possession is as good as the best when established." This rule has been recognized and applied in this jurisdiction for many years, in Kirton v. Bull, 168 Mo. 622, 68 S.W. 927 and Ridgeway v. Holliday, 59 Mo. 444, 453. In the latter case the court said, "The possession of an adverse occupant need not be transferred by deed. * * * The adverse possession, of which the plaintiff had a right to avail himself * * * was more than ten years. This possession would not only bar a recovery by Voteau, but it extinguished his title and conferred it upon the plaintiff." In the now leading case of Auldridge v. Spraggin, 349 Mo. 858, 163 S.W.2d 1042, the record owner of a lot, "which includes the strip in question," had, in 1939, successfully prosecuted an action in ejectment against the plaintiff-Auldridges' grantor. Nevertheless, when the Auldridges as plaintiffs instituted and prosecuted the instant suit to quiet title, claiming adverse title through their predecessors under a parol gift, the court recognized that ordinarily ejectment would have interrupted the running of the statute of limitations. But the court, in reversing the trial court and ordering a decree in favor of plaintiffs said, "However, at the time the judgment was entered, the Statute had long since run and title had been established so that such rule is not now pertinent. The fact that the strip was not expressly described in the deeds in plaintiffs' chain of title does not affect plaintiffs' claim of ownership. The rule appears to be where land adversely held is included in the same enclosure with land owned and conveyed by the grantor, the taking of possession by the grantee of the entire enclosed area creates a privity with the grantor as to the portion not conveyed." 349 Mo. l.c. 864–865, 163 S.W.2d l.c. 1045. These principles were most recently applied in an easement by prescription case in Division Two, Speer v. Carr, Mo., 429 S.W.2d 266. There, as here, the defendant relied on permissive use in an immediate claimant. The court held, however, assuming permission that plaintiffs were entitled to judgment: "This, for the reason that we find from the undisputed evidence that the easement had been established long before 1947. * * * *Since the easement had been established by plaintiffs' predecessors in title it would continue until extinguished.*"

■■ The absolute title by adverse possession being thus established in the respondents' predecessors the only problem is whether they have transferred that title and occupancy to Mr. John and the respondents. And that again as with adverse possession itself is a question of intention. This question too is answered by Auldridge v. Spraggin but to make the point perfectly clear, "Where a person having title by deed to a lot or tract of land described in the deed also has inclosed with it and is in possesson of adjoining land to which he has no record title and conveys the land by the description in the deed, and delivers with

it the possession of the entire inclosure, the continuity of possession will not be broken and the two possessions may be joined and considered as one continuous possession. *The point at issue is the intended and actual transfer of possession of the land held adversely.*" 5 Thompson, Real Property, Sec. 2551, p. 565. As previously noted "The possession of an adverse occupant need not be transferred by deed." Ridgeway v. Holliday, 59 Mo. l.c. 453. In 1872 the court said, "Not even a writing is necessary if it appear that the holding is continuous and under the first entry." Crispen v. Hannavan, 50 Mo. 536, 549.

■ In this case there can be no doubt as to the intenton of John or of the respondents. John testified that he took possession of and claimed all the land to the fence line and as previously stated he said that he and all prior occupants for 40 or 50 years had "sold and resold" the tract. But again the crucial time is the Selbys' occupancy, 1945 to 1958, and what they intended with respect to their grantee, G. A. John. And on this precise point Mrs. Pauley, the Selbys' administratrix and transferor had this to say:

"Q. And you sold it as it was—

"A. (Interrupting) As it was, to him (John).

"Q. (Continuing)—in that whole tract inside the enclosure?

"A. Yes.

\*   \*   \*   \*   \*   \*

"Q. Did you sell him the whole tract inside of the fence?

"A. Well, I guess I did.

"Q. Well, was that your intent?

"A. That was—well, that was what I thought I sold."

A precisely applicable and governing case, as indicated by Thompson, is Miller v. Medley, Mo., 281 S.W.2d 797. There, at the time of purchase " 'Mr. McElyea stood and

pointed these lines out to me when we were looking over it,' he told him that the boundary line of Lot 4 was the quarter-section line west to the St. Francis River. In these circumstances Miller succeeded, as far as the character of the land and the circumstances permitted, to Mr. McElyea's possession (Abeles v. Pillman, 261 Mo. 359, 168 S.W. 1180) or 'possessory claim' so there was privity of possession between Mc-Elyea and Miller, the disputed area was then enclosed with the contiguous land described in the conveyance and so, if necessary, Miller was entitled to tack his possession to that of McElyea."

As indicated in Miller v. Medley a transfer of possession to John and from him to the church would permit "tacking" of their possession to that of their predecessors. But in view of the fact, as in Auldridge v. Spraggin, that an indefeasible title has been established in John it is not believed that tacking is either necessary or in point of fact involved upon this record. "The doctrine of 'tacking' is one which permits an adverse possessor to add his period of possession to that of a prior adverse possessor in order to establish a continuous possession for the statutory period." 3 Am. Jur.2d § 58, p. 146. Here the necessary "continuous possession" and all the elements of title by adverse possession had been established long before the transfers to either John or the respondents. As stated there was privity between the Selbys and John and if tacking is involved all the elements of the doctrine are present here and sustain "the composite fact to be established is the intended and actual transfer or delivery of possession of such area to the grantee or vendee as successor in ownership or claim." Annotation 17 A.L.R.2d 1128, 1131–1132. The case plainly setting forth the facts necessitating the application of the doctrine of tacking is the now leading case of Feinstein v. McGuire, Mo., 297 S. W.2d 513. In that case the only adverse occupants were the plaintiff and his immediate grantors, Munday and Thielecke. And they "were in possession for a period

of 9 years, 9 months and 26 days"—2 months and five days short of the necessary ten years. The court held that their occupancy had been adverse but the plaintiff did not testify and "(t)here is no evidence whatever that he went into the possession of this farm" and there was no circumstance from which it could be inferred and so the court was compelled to reverse the judgment. But even in that case the court did not hold that plaintiff could not establish the right to tack his two months and five days' possession, the court assumed "that plaintiff could have presented evidence as to his conduct in regard to taking possession of the land" and so the cause was remanded to "allow an opportunity to each party to present evidence on the issue as to plaintiff's possession, if any, of this land between the date of the commissioner's deed and the time he instituted this suit." Barker v. Allen, Mo., 273 S.W.2d 191, is another case, with many circumstances comparable to this case, precisely illustrating the applicability of the doctrine of tacking. "Where the area not within the description of the instrument was inclosed with that in fact described and the purchaser entered into possession of the whole, the implication of a transfer of possession of the whole is usually very strong, and in ordinary circumstances amounts to a sufficient basis for tacking the two possessions notwithstanding the absence of words of express delivery of the entire inclosure." 17 A.L.R.2d l.c. 1162; Auldridge v. Spraggin, supra.

But title having been established in John and the respondents the only remaining problem is whether either of them has done anything to destroy that title, or, interrupt the running of the statute of limitations. The only thing relied on by the appellant, Mrs. Crane, is the statement in her brief that "a predecessor had undertaken to change the record title to the land which they owned without including the disputed tract to which they did not have record title, thereby acknowledging that they had no title to the disputed tract and admitting the existence of paramount title in someone other than themselves, namely in appellant; thus their possession was not hostile and adverse to appellant for the statutory period." It is not necessary to analyze this assignment of error and indicate just what it encompasses. It refers to these circumstances: G. A. John acquired title and possession by the conveyance from the Selby estate on March 16, 1958. Having some doubt as to the accuracy of the lines and the correct description of the area he had purchased and occupied John, on June 5, 1958, caused a survey to be made and that survey, along "where the old fence was" showed that the disputed strip was in Block 30 and within the description of Mrs. Crane's legal title. Some time after the survey John's lawyer asked Mrs. Pauley, representing the Selbys, for a quitclaim deed. Mrs. Selby consulted her lawyer, who, incidentally, is Mrs. Crane's lawyer, and he advised her against giving John a quitclaim deed. Mrs. Pauley, even on cross-examination by her own lawyer, had this to say: "Well, you advised me to tell him —to sell it as it was. (Answer, Continuing) Now, I don't know how—what you mean, unless that's it. Q. Well— A. (Interrupting) Just take the land as it was fenced now that is the way I took it, was the way the fence was around it." In passing it must be noted that there were no specific representations as to why a conveyance was asked, in any event no deed was given. And, incidentally, John remained in possession and ownership for three more years and Mrs. Crane did not institute this action until April 20, 1963, four years and ten months after the survey and after the church constructed its building and driveway. Walters v. Tucker, Mo., 308 S.W.2d 673, 680.

In any event these circumstances do not have the force and effect attributed to them by the appellant's assignment of error and they did not interrupt the running of the statute or compel the invocation of the doctrine of tacking. Even "the purchase of an outstanding title, interest, or

claim to land by an adverse holder thereof will not of itself interrupt the continuity of his adverse possession, as to others." Annotation 125 A.L.R. 825, 826; Feinstein v. McGuire, 297 S.W.2d l.c. 157. In the latter case "the fact that these tax sale purchasers obtained a quitclaim deed from the McCafferty sisters, and that Thielecke had sought to contact defendant to negotiate for such a deed, would not destroy the hostile nature of their possession." In Sanderson v. McManus, Mo., 252 S.W.2d 351, a controversy with "its origin in an erroneous survey," this rule was applied to an attempt to purchase a three-foot strip from plaintiffs in *1946* or *1947*. In addition to applying the rule, the court added, "Another important factor is that *upon the expiration of the limitation period in 1944*, defendants' title could be lost or divested only in the same manner as a title by grant." And in Speer v. Carr, 429 S.W.2d l.c. 269, this division said, "And, it is well settled that the testimony relied on by defendants relating to permission would not be sufficient to extinguish the easement. '[I]t is a general rule that an easement, once established, is not divested by the acts of the owner of the easement in seeking and obtaining permission or license from the owner of the servient estate to make the same use of the latter's premises as could be made under the existing servitude.' "

In this total background and upon this particular record Croy v. Zalma Reorganized School Dist. R-V, Mo., 434 S.W.2d 517 has no relevance. That was "a suit in equity to reform a deed" (and that was the essence of the case) to an acre of ground by compelling a conveyance of additional land (the title to which was claimed by adverse possession) on the theory that "it was intended to be included in, but by mutual mistake was left out of, the grant." Croy, the plaintiff, purchased the one acre on a bid of $125.00 from the school district on the assumption that the school building was on the one acre. In the first place the court held, and that should have been determinative of any suit to reform a deed, that

"Plaintiffs failed to meet the burden of proving that the parties intended to include the adjoining land in the quitclaim deed or that it was omitted by mutual mistake of fact." As to adverse possession the court concluded, "There is no necessity of deciding that question in this case. Plaintiffs failed to establish the foundation stone of their cause of action, namely, that by mutual mistake the quitclaim deed failed to memorialize the transaction upon which the parties agreed." A precisely applicable case carefully employing the rules of the Croy case is Moore v. Helvy, 235 Mo. 443, 138 S.W. 481.

On the surface Lurvey v. Burrell, Mo., 317 S.W.2d 458, would appear to have some relevance to this cause. It was a suit to determine title to a ten-foot strip. The defendants own the land to the west and claim to own the strip by deed. The plaintiffs own the adjoining land to the east and "claim that they are the owners of the strip by adverse possession," and, it may be said, "that a fence had been built about 10 feet west of the boundary line described in the deeds which is the west line of the 10-foot strip." It is not necessary to detail all the circumstances, (the record in that case, briefed and argued by the appellant only, has been read), it is sufficient to say that for four or five specified reasons "plaintiffs cannot maintain the present action for the reason that they do not have any interest in the land in controversy." One of the factors, one emphasized in the principal opinion, was that plaintiff called as a witness one of his predecessors in title and "she testified that *it was not intended that the land in dispute be conveyed.*" And the court concluded, "In such circumstances, the grantor in this case did not acquire any interest in the 10-foot strip and hence could not convey any to the plaintiffs." As to adverse possession, in three or more instances the court specifically pointed out that it was not deciding any issue of adverse possession. However, the court pointed out, as a reading of the record clearly reveals, "the evidence did not justify a finding

that title by adverse possession had been acquired by the predecessors in title before the Drummonds (plaintiff's predecessor-grantor) purchased the land." And finally, it should be noted that the cause was left in this anomalous posture: the court refused to decree title in the defendants, this "for the reason that the Drummonds may have or may claim an interest in the property" which, it may be added, could only be by adverse possession. Many other differentiating factors could be noted but the fact that the issue of adverse possession was not considered is sufficient to distinguish that case from this one. In another connection the Lurvey case was distinguished in Dalton v. Johnson, Mo., 320 S.W.2d 569, 574. On its particular facts and presentation the Lurvey case is not open to criticism, it is simply not applicable to this record and appeal and does not lay down any principle in conflict with the rules announced and followed in this opinion.

■ And finally, while the review of this appeal is anew upon both the law and the evidence (Civil Rule 73.01(d), RSMo 1959, § 510.310, V.A.M.S.), the trial court's findings may not be ignored and since they are indeed supported and a contrary conclusion upon any essential, determinative issue is not compelled as a matter of law, the court's finding is entitled to considerable deference. Grimes v. Armstrong, Mo., 304 S.W. 2d 793; Sanderson v. Less, Mo., 296 S.W.2d 81, 85.

This disposition of the cause also disposes of Counts II and III for trespass and damages.

For the reasons indicated the judgment is affirmed.

STOCKARD and PRITCHARD, CC., concur.

PER CURIAM:

The foregoing opinion by BARRETT, C., is adopted as the opinion of the court.

DONNELLY and EAGER, JJ., concur.

FINCH, P. J., concurs in result in separate concurring opinion filed.

FINCH, Presiding Judge (concurring).

I have concluded to concur in the result reached by the principal opinion herein.

The evidence shows that G. A. John, the grantor of defendants, acquired a deed to a 16.71 acre tract from the heirs of Ellen T. Selby on March 16, 1958. That deed described by metes and bounds a tract to which the Ellen T. Selby heirs had record title and which was located adjacent to and immediately south of Block 30 in Ashland. The deed did not describe any part of Block 30.

When Mr. John undertook to purchase the land in question, he realized that a question existed as to the boundary line between the Selby tract and that owned by the plaintiff in Block 30. Accordingly, Mr. John and the Selby heirs had a survey made. It disclosed that the fence to which the principal opinion refers was actually north of the south line of Block 30. Mr. John's attorney then sought to obtain a quit claim deed from the Selby heirs to the land which lay north of the south line of Block 30 and south of the fence line in question but the Selby heirs refused to give that deed.

The principal opinion holds that the evidence was sufficient to establish title by adverse possession in Ellen T. Selby to the disputed strip of land lying between the fence and the south line of Block 30. That holding is in accordance with the decree of the trial court and I do not disagree that the evidence is sufficient to support and justify such conclusion.

The crucial question herein is whether the interest of Ellen T. Selby in that tract was transferred by her heirs to Mr. John, and thence to defendants. This question necessarily must be decisive because the

combined period of possession of Mr. John and the defendants is less than ten years.

In my view the applicable rule is that stated in Lurvey v. Burrell, Mo., 317 S.W.2d 458, 461, as follows: "It is a well established rule of law that there must be a conveyance of property claimed by adverse possession by some act (by gift or otherwise) in order to effectuate a transfer of such property from the adverse holder to the grantee. Absent this, there can be and there is no transfer to the grantee of any right acquired by the grantor." [1]

Lurvey v. Burrell involved a situation in which title to a 10-foot wide strip was in dispute. Defendants in that case held record title to the strip and plaintiffs claimed title by adverse possession to an existing fence which the survey showed to be 10 feet within defendants' tract. Plaintiffs' predecessor in title had received a deed which did not include the 10-foot strip in the metes and bounds description used therein.

Division One of this Court held in Lurvey v. Burrell that plaintiffs' grantor did not acquire title to the disputed 10-foot strip. As a result plaintiffs did not have title thereto. The Court said, 317 S.W.2d l.c. 461–462: "In the case before us, the deed not only did not include the land in question but after both grantor and grantee were fully aware of the situation, the grantor knowingly did not include the disputed area in the deed and the grantee with knowledge of that fact accepted the deed. Furthermore, one of the grantors was a witness called by the plaintiffs and she testified that it was not intended that the land in dispute be conveyed. In such circumstances, the grantor in this case did not acquire any interest in the 10-foot strip and hence could not convey any to the plaintiffs."

In the case presently on appeal, one of the grantors (Mrs. Pauley), who conveyed

to Mr. John, testified that she understood that the grantee would take the land as it was then fenced. (This would include the disputed strip.) She said that this was what she thought she sold. In this important aspect, the facts herein differ from those in Lurvey v. Burrell as set out above. That difference provides a basis on which the trial court herein could conclude that the Selby heirs did intend to transfer their interest in the land up to the fence to Mr. John. While this testimony of Mrs. Pauley was somewhat inconsistent with the refusal of the Selby heirs to give a quit claim deed, she did explain that this was done on advice of their attorney to leave things as they were. The trial court heard the witnesses and had an opportunity to judge their credibility. Deferring to that determination does not result in questioning the soundness of the rule announced in Lurvey v. Burrell.

---

1. This rule is not applicable to appurtenant easements which pass with the deed to the dominant tenement even though not described or referred to. Dalton v. Johnson, Mo., 320 S.W.2d 569; Benson v.

Fekete, Mo., 424 S.W.2d 729. It does represent the rule when passage of fee title to adjacent land acquired by adverse possession is involved.