Wilbur SLENTZ et al.,
Plaintiffs-Appellants,

v.

CHEROKEE ENTERPRISES, INC. and
Gerald D. Simkins,
Defendants-Respondents.

No. 9687.

Missouri Court of Appeals,
Springfield District.

Oct. 27, 1975.

Bob J. Keeter, Schroff, Keeter & Glass, Inc., Springfield, for plaintiffs-appellants.

Leland C. Bussell, David W. Bernhardt, Bussell, Hough, Greene & Bernhardt, Springfield, for defendants-respondents.

Before STONE, P. J., and HOGAN and FLANIGAN, JJ.

FLANIGAN, Judge.

This is an action to quiet title.

Plaintiffs-appellants are five married couples, each owning a lot in Cinderella Village, "a subdivision in Greene County, Missouri." Defendant-respondent Cherokee Enterprises, Inc.[1] is the owner of land adjoining, and located west of, plaintiffs' lots.

Lot 16, owned by plaintiffs Correll, is the northernmost lot. Lot 18, owned by plaintiffs Larkins, is adjacent to and south of the Correll lot. The Nagy lot, Lot 20, is south of the Larkins lot, the Slentz lot, Lot 22, is south of the Nagy lot, and the Morriset lot, Lot 24, is south of the Slentz lot.

The north-south dimension of the area in dispute is 455 feet. Its width at the north end, west of the Correll lot, is 14.8 feet and its width at the south end, west of the southern border of the Morriset lot, is 10 feet.

The claim of plaintiffs to the disputed area is based on adverse possession; the claim of defendant Cherokee to that area is based on record title. The west side of the disputed area is marked by "an old fence" and the east side of it is the true boundary line as shown by a survey based on record titles.

In the petition each set of plaintiffs requested a decree adjudging them to be the owners of that portion of the disputed area lying west of their respective lots. The counterclaim of defendant Cherokee requested a decree "quieting title in the defendants to the disputed property." Both the petition and the counterclaim contained additional claims but they are no longer in dispute.

The trial court, after making findings of fact and conclusions of law, found in favor of defendant Cherokee and declared that Cherokee was the owner of the disputed strip. Plaintiffs appeal.

■ This court must review this non-jury case upon both the law and the evidence as in suits of an equitable nature and must give due regard to the opportunity of the trial court to have judged the credibility of witnesses. Rule 73.01, par. 3, V.A.M.R.

■ Since plaintiffs base their claim on adverse possession, the burden of proof as to each of the five elements[2] of adverse possession is on plaintiffs. *Wilton Boat Club v. Hazell*, 502 S.W.2d 273, 276[5] (Mo. 1973). However, once the plaintiffs made a prima facie case on the issue of adverse possession, the burden of going ahead on that issue shifted to the defendants. *Sandy Ford Ranch, Inc. v. Dill*, 449 S.W.2d 1, 4[1] (Mo.1970) and authorities there cited.

■ Although the reviewing court will defer to the findings of the trial court where credibility of witnesses is involved, the reviewing court need not do so where "a disputed question is not a matter of direct contradiction by different witnesses." *West v. Witschner*, 428 S.W.2d 538, 542[7] (Mo.1968). See also *Schott v. Bruce*, 407 S.W.2d 61, 65[6] (Mo.App.1966).

Because certain facts pertain only to the appeals of plaintiffs Correll and Morriset, they will be discussed later.

The appeals of Larkins, Nagy, and Slentz are treated first.

The action was commenced on August 22, 1973. Slentz obtained title to and possession of Lot 22 in June, 1963. Earlier the Nagys and Larkins had acquired their lots. These plaintiffs presented evidence, which need not be detailed, sufficient to make a

1. Another defendant-respondent is Gerald D. Simkins, immediate grantor of Cherokee. Simkins is an officer and shareholder in Cherokee but in the trial court and in this court the parties have treated Simkins as if his interests are identical with those of Cherokee. The disposition of the action makes it unnecessary to accord his position separate discussion.

2. "There are five essential elements necessary to constitute an effective adverse possession: First, the possession must be hostile, and under a claim of right; second, it must be actual; third, it must be open and notorious; fourth, it must be exclusive; and, fifth, it must be continuous." *Swope et al. v. Ward et al.*, 185 Mo. 316, 324, 84 S.W. 895, 896, and quoted in *Wilton Boat Club v. Hazell*, 502 S.W.2d 273, 276 (Mo.1973).

prima facie case on the issue of adverse possession. In general their testimony was that throughout their respective ownerships they had possessed that portion of the disputed strip adjacent to their lots, claiming that the old fence was the boundary line, and exercising open and notorious dominion over the area by planting trees and shrubbery, gardening, and mowing it. The "old fence" had been there at least since 1958. Photographs were introduced in support of plaintiffs' testimony.

There was also testimony that one Meeks, defendants' predecessor in title, had recognized the old fence as being the boundary line.

The evidence of these plaintiffs shifted to the defendants the burden of going forward on the issue of adverse possession. The evidence adduced by the defendant falls short of sustaining that burden.

Defendants' witnesses were Bill MacLachlin, Allen Cates, and Gerald Simkins. Their testimony disclosed the following: Simkins and MacLachlin obtained record title to the disputed area on September 22, 1972, and conveyed it, with other land, to Cherokee in November, 1972. Sometime after March, 1973, plaintiff Larkins told MacLachlin that he, Larkins, knew where the true boundary line was. MacLachlin knew that the plaintiffs were using the disputed area "but I figured that they had been given permission to use it . . . I just took it for granted."

Cates made a survey for Simkins in September, 1972, and the survey showed the location of the true boundary line which was east of the old fence. On the ground Cates found some pins which indicated the location of the true boundary line. Cates noticed "some pretty good sized trees" were in the disputed area and they had been there several years. He noticed also that east of the old fence the yards were maintained in a mowed and clipped condition, while on the west side of the old fence it was pasture land. Cates said "In two of the places I can remember," without specifying which two, "the people living in the houses east of the fence were using as their yards the land right up to the fence."

Cates also testified that while Simkins, for Cherokee, was having the area surveyed and platted, Simkins "had some question about whether the fence was where he owned or whether the property line was where he owned," the "property line" meaning the true line as disclosed by Cates' survey.

Simkins testified that Cherokee platted an area in February, 1973, as "Cherokee Estates Second Addition" and this area included the strip in dispute. After the area had been platted, and Simkins and his associates started to install utilities, Simkins first became aware that plaintiffs were making an adverse claim. However, he had not had any conversation with any of the plaintiffs prior to March, 1973. When Simkins talked with the plaintiffs "they seemed to know where the true line was." Simkins admitted seeing the old fence and seeing "the way the lands were being used up to the old fence." Simkins did not ask the plaintiffs whether the plaintiffs were claiming ownership up to the fence, although the plaintiffs indicated they knew the location of the true boundary line. Simkins also testified that "[i]t is probably true that later on when the plaintiffs found out I was contending their ownership did not go to the fence that they had used for years, they told me they did not agree with me."

■ The trial court found that "plaintiffs' use of the disputed land which they are claiming has been with the permission of the defendant and its predecessors in title and plaintiffs knew that prior to the platting and use of the said property by defendants the plaintiffs had no legal title to the disputed land." The portion of this finding dealing with permission is not supported by the evidence. No plaintiff testified that his use was permissive. MacLachlin, who may not have seen the disputed area prior to September, 1972, and who had no conversation with any plaintiff prior to

March, 1973, testified that he "figured that they had been given permission to use it. I just took it for granted. I did not make any investigation." Such testimony does not support a finding of permissive use.

Neither Cates nor Simkins offered any testimony supporting a finding of permissive use.

Although most of the plaintiffs testified that they believed the old fence to be the true boundary line, there was testimony that some of them knew the location of the true boundary line. However, such latter knowledge, assuming it existed, is not an impediment to a valid claim of adverse possession.

"In determining the character of the possession, the important factor is, not whether the true line is known or whether there is a mistake as to the boundary, since the location of a fence beyond the true boundary line is usually due to mistake, but it is the intent with which the boundary fence is built and the unequivocal character of the claim made thereafter, which is decisive of the question. . . . In short, the determining factor is not what the encroaching owner knew about the true boundary line, but what he intended to unequivocally claim was his boundary line." *Bell v. Barrett,* 76 S.W.2d 394, 396[3] (Mo.1934). See also *Pollock v. Bouse,* 430 S.W.2d 149, 151 (Mo.1968).

The important thing is that the evidence of plaintiffs showed that each of their respective possessions of the disputed area was coupled with "the intent to possess."[3]

Defendant Cherokee relies upon the following findings of fact made by the trial court:

1. "Defendants and their predecessors in title are the true record owners of the real estate in question."

2. "Defendant Cherokee Enterprises, Inc. and its predecessor in title have owned the real estate in question since common ownership, have paid taxes thereon, and have claimed said property at all times and in all conveyances since common ownership."

3. "Plaintiffs and their predecessors in title have not been in open, notorious, uninterrupted and continuous possession of said property for the required period of ten years."

Plaintiffs argue, validly, that finding of fact no. 1 is in the nature of a conclusion of law. If the finding is that the record title of plaintiffs did not extend westward to the old fence, that fact was conceded. It is, of course, not determinative of the basic issue of whether plaintiffs have, by adverse possession, acquired title to the disputed area. If, as this court holds, plaintiffs did acquire title by adverse possession, that title "is as good as the best when established." *Crane v. Loy,* 436 S.W.2d 739, 743 (Mo.1968).

■■ Finding of fact no. 2 is not controlling. Though it is true that Cherokee and its predecessor did have record title to the disputed area, that title has been superseded by plaintiffs' title gained through adverse possession. With respect to taxes, Simkins testified that "at the end of 1972 and in 1973" he paid the taxes on land

3. "If the possessor occupies the land in question intending to occupy that particular piece as his own, his occupancy is adverse. It is not necessary that he intend to take away from the true owner something which he knows belongs to another, or even that he be indifferent as to the facts of the legal title. It is the intent to possess, and not the intent to take irrespective of his right, which governs. Possession is a legal concept. It involves two things: A present or, in the case of constructive possession, a past ability to control the thing possessed plus an

intent to exclude others from such control. Or, in the language sometimes used in the cases, to exercise dominion over the object possessed. One may have such an intent in the case of property actually belonging to another, because he intentionally wants to take it away from the owner. But he may also have this intent because he is mistaken as to the facts of legal ownership." *State ex rel. Edie v. Shain,* 348 Mo. 119, 152 S.W.2d 174, 176, quoted with approval in *Boeckmann v. Fitzpatrick,* 491 S.W.2d 524, 527 (Mo.1973).

which included the disputed area. However, "[t]he mere payment of taxes does not create title, and likewise the mere nonpayment of taxes does not divest title." *Conran v. Girvin*, 341 S.W.2d 75, 91[19] (Mo. banc 1960). See also *Pioneer Cooperage Co. v. Dillard*, 332 Mo. 798, 59 S.W.2d 642, 644[2] (1933). That portion of the finding to the effect that Cherokee and its predecessor "claimed said property at all times" is not supported by the evidence. Indeed, the testimony, admitted without objection, was that Meeks, defendants' predecessor, made the statement to plaintiff Nagy, in 1964 or 1965, that the old fence was the boundary line. There was no testimony to the contrary.

Finding of fact no. 3 was not supported by the evidence. The testimony of plaintiffs was clearly to the effect that they had been in their respective possession for ten years and that such had been "open, notorious, uninterrupted, and continuous." Nothing in the evidence adduced by defendants materially contradicted plaintiffs' evidence in that respect.

Thus, the trial court erred in not finding in favor of plaintiffs Larkins, Nagy, and Slentz on their respective claims to be the owners of those portions of the disputed area lying west of their lots.

The same arguments which Cherokee made against the claims of Larkins, Nagy, and Slentz were also leveled against plaintiffs Morriset and Correll, and they are similarly unavailing with respect to the latter plaintiffs.

With respect to the claim of Morriset, defendants advance the additional argument that the Morrisets "clearly did not claim the property in question adversely at any time including the day of trial." This argument is factually unsound. Mr. Morriset testified that his ownership and possession of Lot 24, including the disputed strip west of it to the old fence, commenced in February, 1962; that he intended to possess the land up to the old fence and thought the old fence was the actual boundary and

thought that he owned up to the old fence. On cross-examination he testified that he did not know that Simkins was making any claim to the disputed area until the summer of 1972.

Defendants stress that portion, which is somewhat lacking in clarity, of Morriset's testimony to the effect that Morriset told Simkins that Morriset would move a shed "over onto (Morriset's) lot." The reasonable inference is that the shed was on the disputed area.

The defect in defendant's argument is that Morriset's title, by adverse possession, had ripened in February, 1972, prior to any conversation with Simkins concerning the shed. "As to the land, adverse possession for the statutory period establishes an indefeasible legal title in the possessor, the title of the record owner is divested and, unlike the easement cases, that title is not lost by abandonment (*Feeler v. Reorganized Dist. No. 4*, supra [Mo., 290 S.W.2d 102]; 1 Am. Jur., Secs. 11, 13, pp. 796, 797; 2 C.J.S. Adverse Possession §§ 199–201, 208, pp. 803, 807) or mere failure to assert title after it has been perfected." *La Grange Reorg. Sch. Dist. No. R–VI v. Smith*, 312 S.W.2d 135, 139[7] (Mo.1958).

Mrs. Morriset testified that throughout their occupancy of Lot 24 they had used the back yard area up to the old fence and "intended to take up to the fence."

The trial court erred in not finding in favor of plaintiffs Morriset on their claim to that portion of the disputed area lying west of Lot 24.

With respect to the claim of Correll, defendants advance the additional argument "that these appellants were not in possession of the property for the requisite ten years; there was no showing that the predecessor in title of these appellants intended to claim the land in question; the conveyance by which these appellants took title to their property did not describe the land in question, which indicates that there was no intention to claim the property adversely."

The Corrells moved to Lot 16 on December 5, 1963, at which time they rented it from Robert Quigg, then the owner. Quigg had acquired the property in 1959. The Corrells bought the property from Quigg in 1969. Throughout the Quigg and Correll possessions, they respectively possessed the disputed area west of Lot 16 and up to the old fence. The disputed area was mowed, and flowers were planted in it. Clothes line posts set in concrete were placed in it by Quigg. Correll testified, without objection, that Quigg "said the fence line was the boundary." Correll said that he intended to possess up to the old fence and did so.

"The doctrine of 'tacking' is one which permits an adverse possessor to add his period of possession to that of a prior adverse possessor in order to establish a continuous possession for the statutory period." 3 Am.Jur.2d Adverse Possession § 58, p. 146, quoted with approval in *Crane v. Loy*, 436 S.W.2d 739, 744 (Mo.1968). Crane also contains the following language at p. 743: "Where a person having title by deed to a lot or tract of land described in the deed also has inclosed with it and is in possession of adjoining land to which he has no record title and conveys the land by the description in the deed, and delivers with it the possession of the entire inclosure, the continuity of possession will not be broken and the two possessions may be joined and considered as one continuous possession. The point at issue is the intended and actual transfer of possession of the land held adversely."

The acts of Quigg, coupled with his knowledge, although mistaken, that the fence was the boundary line, permit the "tacking" of the Quigg and Correll possessions and the statutory period of ten years is satisfied. *Auldridge v. Spraggin*, 349 Mo. 858, 163 S.W.2d 1042 (1942); *Landers v. Thompson*, 356 Mo. 1169, 205 S.W.2d 544, 546[5, 6] (1947). See also annotation in 17 A.L.R.2d 1128 ("Tacking adverse possession of area not within description of deed or contract").

The trial court erred in not finding in favor of plaintiffs Correll on their claim to that portion of the disputed area lying west of Lot 16.

The judgment is reversed and the cause is remanded with directions to the trial court to enter judgment quieting title in the respective plaintiffs to those portions of the disputed area lying west of their respective lots.

All concur.