Leonard SHANKS and Naomi Shanks,
Plaintiffs–Appellants,

v.

Roger HONSE, Defendant–Respondent.

No. SD 31460.

Missouri Court of Appeals,
Southern District,
Division One.

April 26, 2012.

810

Deborah K. Dodge, Springfield, MO, for Appellants.

Jonathan C. Browning, Jefferson City, MO, for Respondent.

DON E. BURRELL, Presiding Judge.

Leonard and Naomi Shanks, husband and wife, filed a petition claiming that they had acquired ownership by adverse possession of a portion of land ("the disputed property") whose owner of record was their neighbor, Roger Honse. The petition asked the court to quiet title in the Shanks' name, eject Mr. Honse from the disputed property, and award the Shanks money damages for Mr. Honse's trespass. Mr. Honse counterclaimed, asking the court to confirm his ownership of the disputed property, eject the Shanks from it, and award him money damages for the Shanks' trespass.

After a bench trial, the trial court issued a judgment quieting title to the disputed property in Mr. Honse and awarding him $2,049.70 in monetary damages.[1] Mrs. Shanks[2] now appeals, claiming the trial court erred in denying her adverse possession claim because she offered substantial evidence in support of the three elements the trial court found had not been proven—that the Shanks' possession was: 1) actual; 2) hostile; and 3) open and notorious.[3] Because Mrs. Shanks had the burden of proof on her adverse possession claim, and the trial court was not required to believe her evidence, we affirm.

**Applicable Principles of Review & Governing Law**

We must affirm the trial court's judgment unless no substantial evidence sup-

---

1. The damages for Mr. Honse's trespass claim were based on a finding that trees on the disputed property valued at that amount were cut and sold by Mr. Shanks after Mr. Honse told him not to do it.

2. Although the lawsuit was initiated by both Mr. and Mrs. Shanks, Mr. Shanks died before the trial commenced. His deposition testimony was received into evidence at trial as Plaintiff's Exhibit 1.

3. Mrs. Shanks filed a motion seeking leave to file her notice of appeal out of time because her counsel anticipated—based on a hand-written annotation made by the trial court on its original judgment—that "an amended judgment would be executed at some point." The trial court later amended its judgment at this court's direction to add the legal description for the disputed property that the trial court had referenced in its original judgment but had not actually included. Mrs. Shanks' motion, which was taken with the case, was rendered moot by the entry of that amended judgment; her earlier-filed notice was then timely as it was deemed by rule to have been entered on the date the trial court entered its amended judgment. Rule 81.05(b), Missouri Court Rules (2011).

ports it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). "This standard applies in adverse possession cases." *Reynolds v. Brill*, 302 S.W.3d 716, 718 (Mo.App. S.D.2010). "Substantial evidence is that evidence which, if true, has probative force upon the issues, and from which the trier of fact can reasonably decide the case." *Kenney v. Wal–Mart Stores, Inc.*, 100 S.W.3d 809, 814 (Mo. banc 2003) (quoting *Zeigenbein v. Thornsberry*, 401 S.W.2d 389, 393 (Mo. banc 1966) (internal quotations and citation omitted)).

In applying this standard we defer to the trial court's credibility determinations and view the evidence and permissible inferences in the light most favorable to the judgment, disregarding all

contrary evidence and inferences. *Williams v. Frymire*, 186 S.W.3d 912, 916 (Mo.App. S.D.2006). The trial court is in a better position to judge the credibility of the parties and, as such, is free to believe none, part, or all of any witness's testimony. *Id.*

*Bowles v. McKeon*, 217 S.W.3d 400, 404 (Mo.App. S.D.2007).[4]

"The party claiming ownership by adverse possession has the burden of proving his claim by a preponderance of the evidence." *Watson v. Mense*, 298 S.W.3d 521, 526 (Mo. banc 2009). "There is a presumption that the record owner of wild and vacant land is the actual owner." *Eime v. Bradford*, 185 S.W.3d 233, 236 (Mo.App. E.D.2006).

There is no obligation upon an owner to reassert his ownership by an actual tak-

---

**4.** The lion's share of Mrs. Shanks' brief consists of comparing the evidence she produced at trial to evidence adduced in cases where similar evidence was found sufficient to sustain a judgment for adverse possession. *See, e.g., Watson v. Mense*, 298 S.W.3d 521, 526 (Mo. banc 2009) (trial court did not err in finding actual possession based upon evidence of continual farming, pasturing, and cultivation of land); *Weaver v. Helm*, 941 S.W.2d 801, 805 (Mo.App. S.D.1997) (element of actual possession noted in dicta in addition to a finding of hostile possession); and *Forester v. Whitelock*, 850 S.W.2d 427, 429 (Mo.App. S.D.1993) (trial court's finding of actual possession upheld based upon "ample evidence" in the record of occupying, clearing, pasturing, fencing and building a levee on the land). Such comparisons are of little or no value here because the reviewing court in those cases was required to accept as true the evidence favorable to the judgment and disregard all contrary evidence and inferences. In a case where the adverse possession claim is denied, the converse is true; we are required to disregard all evidence favorable to the claim. *Bowles*, 217 S.W.3d at 404. Mrs. Shanks' position is that while this court must defer to the trial court "where credibility of the witnesses is involved, the reviewing court need not do so where 'a disputed question is not a matter of direct contradiction by differ-

ent witnesses[,]' " (quoting *Slentz v. Cherokee Enterprises, Inc.*, 529 S.W.2d 495, 496 (Mo. App.Spfld.D.1975) (internal citation omitted)). We disagree. While some cases decided after *Slentz* have also used similar language, *see, e.g., In re Baby Girl P.*, 188 S.W.3d 6, 10 (Mo.App. W.D.2006) and *Hopkins–Barken v. Director of Revenue*, 55 S.W.3d 882, 885 (Mo. App. E.D.2001), we believe such language no longer constitutes a correct statement of the law in light of our high court's decision in *White v. Director of Revenue*, which clarified the difference between "uncontradicted" and "uncontested" evidence. 321 S.W.3d 298, 308 (Mo. banc.2010). "It is only when the evidence is *uncontested* that no deference is given to the trial court's findings." *Id.* (emphasis as stated in original). "When evidence is contested by disputing a fact in any manner, this Court defers to the trial court's determination of credibility." *Id.* "When the burden of proof is placed on a party for a claim that is denied, the trier of fact has the right to believe or disbelieve that party's uncontradicted or uncontroverted evidence." *Id.* at 305; *accord Strayer v. State*, 339 S.W.3d 621, 623, 624 (Mo.App. W.D.2011) (holding that the trial court, "as the trier of fact, did not have to believe the State's assertion" even though the personal representative "presented no contradictory evidence").

ing of possession nor may an owner be divested of his title in default of physical occupancy. The adverse claimant prevails, not because the title owner has failed to exercise dominion but because the claimant has proved his actual and continuous possession and that of those under whom he claims. *J.C. Nichols Co. v. Powell,* 641 S.W.2d 780, 783–84 (Mo.App. W.D.1982). The elements of adverse possession require that the possession be "(1) hostile, that is, under a claim of right, (2) actual, (3) open and notorious, (4) exclusive, and (5) continuous, for ten years prior to commencement of the action to perfect title by adverse possession." *Walker v. Walker,* 509 S.W.2d 102, 106 (Mo. banc 1974). The adverse possessor must prove "each and every element necessary to establish adverse possession for the entire statutory period." *Murphy v. Holman,* 289 S.W.3d 234, 237 (Mo.App. W.D.2009). A failure to prove any necessary element defeats the claim. *Id.* at 240.

### Facts and Procedural Background

We present here the evidence adduced at trial as viewed in the light most favorable to the judgment. *See White,* 321 S.W.3d at 305; *Bowles,* 217 S.W.3d at 404. The disputed property is located in the northwest corner of land Mr. Honse acquired in 2007.[5] The disputed property is triangular in shape and consists of approximately 2.23 acres.[6] A creek or "branch" runs diagonally at the edge of one of the boundaries of the disputed property, and a fence runs along the branch. The disputed property is bordered on its north and west sides by approximately 453 acres of land owned by Mrs. Shanks.

By 1963, the Shanks had acquired the parcels comprising their land, which they used to raise cattle. They filed the instant suit in August 2008. The Shanks had used a gate in a fence on the northern edge of the disputed property to let their cattle onto the disputed property to "pass-through" to another portion of the Shanks' land. After initially stating that his cattle were on the disputed property "continually, winter and summer" and "every day in the winter[,]" Mr. Shanks subsequently admitted that he did not control where the cattle went and that they sometimes "scatter[ed] around over the pasture[.]" At her deposition, Mrs. Shanks agreed that the Shanks rotated their cattle from pasture to pasture and did not always have their cattle on the disputed property.

Mr. Shanks did not recall having any conversations with either Mr. Honse or Mr. Honse's brothers to the effect that the fence along the branch marked a property boundary line. The Shanks did not erect or place any structures on the disputed property. Mr. Shanks had never posted any "no trespassing" or "no hunting" signs

---

5. The land at issue was depicted in Mrs. Shanks' Exhibits 7 and 8, which we glean were identical copies of a survey requested by Mr. Honse, and his brothers, Gary Honse ("Gary") and Wesley Honse ("Wesley"). Because several witnesses share the same surname, we use first names to avoid potential confusion. In doing so, we intend no disrespect or undue familiarity.

6. The description stated in the Shanks' first amended petition referred to the disputed property as consisting of 2.32 acres. The Shanks moved to amend their first amended petition by interlineation to state that the approximate acreage was 2.23 acres as the reference to 2.32 acres was "a scrivener's error." The trial court "ordered that all reference to the acreage or the survey of the real property in all pleadings and responsive pleadings is to be amended to 2.23 acres." In their brief, Mrs. Shanks notes that "[t]hroughout the trial testimony, the disputed property is referred to as 2.23 acres; however, the legal description indicates the property is 2.32 acres." Mr. Honse refers to the disputed property as being "approximately 2.23 acres in size" in his brief.

on the fences around the disputed property, and he had never used "purple paint on [the] trees to let people know not to trespass."

Gary and his wife purchased in 1983 the land they subsequently sold to Mr. Honse in May 2007.[7] Shortly after Gary purchased the land, he read his deed and saw that the disputed property was included in the 170 acres he had purchased. Gary used much of his property for a cattle operation, but he used the disputed property for hunting. When he and his wife sold the land to his brother, Gary intended that the disputed property be included in the sale. However, the attorney he used "wrote the new deed and he worded the deed differently to where it left that corner off of [the] deed." After Mr. Honse and Gary had the property surveyed (the survey later depicted in Mrs. Shanks' Exhibit 7), Gary and his wife conveyed the disputed property to Mr. Honse by quitclaim deed. No one ever claimed to Gary that the Shanks were the owners of the disputed property.

Gary did not consider the fence that ran along the branch to mark the boundary of his property. And "three or four years" after he bought the land, he mentioned to the Shanks' son that the fence did *not* mark the boundary line. Gary testified, "We all took care of the fence [that ran along the branch], me and [my brother] Wesley and I'm sure [Mr. Shanks] took care of it." Gary routinely saw the Shanks' cattle on the disputed property, primarily during the summer months and "off and on" during the winter, but he testified that "there ain't [sic] cattle there 100 percent of the time, no."

Wesley testified by deposition that he had been familiar with the disputed property since he was a young boy. Although he saw the Shanks' cattle on the disputed property, Wesley never saw the Shanks do anything else with the disputed property. No one ever told Wesley that the Shanks owned the disputed property.

Mr. Honse made repairs to the branch fence in 2006, 2007, and 2008. He had also previously helped Gary repair the fence. Mr. Honse recalled that, as a teenager, he and his brothers helped when Mr. Shanks replaced the posts in the branch fence. Mr. Honse also knew that the "fence line" along the branch was not "right." After Mr. Honse purchased Gary's property, he maintained the fence that ran east to west on the north side of the disputed property, as well as the branch fence. Each year when he turned his cattle out, Mr. Honse checked all of the fences across his entire property for tree damage and for areas that needed patching. Mr. Honse sometimes worked on the fences around the disputed property at the same time Mr. Shanks was also working on them. Mr. Honse knew that there were other fences beyond those on the disputed property that were simply used to keep cattle separated and that they ran along ridgelines and were put in other areas where it was convenient to install a fence.

Mr. Honse used the majority of the land he purchased from Gary to "run cattle, cut seed, [and] bale hay." He continued to use the disputed property for hunting and had "hunted down there every year for as long as [he had] been old enough to hunt." Mr. Honse estimated that he would "[d]eer hunt[ ] every year. Rabbit hunt or squir-

<hr/>

**7.** Mr. Honse testified that he purchased a total of 209 acres from Gary and his wife and then sometime in June or July 2007, Mr. Honse sold 55 of the 209 acres back to Gary and his wife. Neither party suggests on ap-

peal that this altered Mr. Honse's interest in the disputed property or changed the configuration of land that he owned immediately surrounding the disputed property.

rel hunt, coon hunt [he would] say average[d] once a month maybe."

While Mr. Honse saw the Shanks or their son "[r]iding a four-wheeler [on the disputed property] to check cows[,]" he primarily saw the Shanks' cattle "[u]p on the top of [a] hill" that was not on the disputed property. Mr. Honse did sometimes see the Shanks' cattle pass through the disputed property or "just go down to graze." Mr. Honse did not give the Shanks permission to use the disputed property, but he allowed it to be "a good neighbor." Mr. Honse never told the Shanks that he thought they were the owners of the disputed property.

Mr. Honse never saw the Shanks use the disputed property in any manner other than to allow their cattle to go onto it. Mr. Honse never saw the Shanks brush-hogging the disputed property (as Mr. Shanks had suggested in his deposition), and he never saw it in a condition that suggested that it had been mowed or brush-hogged by the Shanks. Although Mr. Shanks claimed to have done some bulldozing on the disputed property to "[k]eep the weeds down[,]" the only bulldozing Mr. Honse saw Mr. Shanks do was "[j]ust up on the hill from the disputed property."

In July 2007, Mr. Honse heard that the Shanks were going to "have their farm logged." Mr. Honse called Mr. Shanks when Mr. Shanks "got ready to log" and told him "that [Mr. Honse and his brothers] were pretty sure that the boundary line was off and that [Mr. Honse] would rather him not cut the logs off of it." Mr. Honse had this conversation with Mr. Shanks while he and his brothers "were in the process of getting a surveyor down there[.]" Mr. Honse recalled Mr. Shanks stated "that the fence had been there for a long time and that was pretty much it."

Mr. Shanks confirmed that Mr. Honse had called him about the timber. He re-called, "[Mr. Honse] said they [sic] owned that [disputed property] and [Mr. Honse] didn't want to lose that timber." Mr. Shanks testified that he told Mr. Honse, "I think-I think I own it." Mr. Shanks held this belief because the disputed property "was fenced and a [sic] borderline all the way around it and it had been there all them years." Mr. Shanks had already sold the timber to a buyer, and he did not want to "back out on it" so "the loggers went ahead and cut the timber." Mr. Shanks was paid for the timber, but he could not recall how much he received or the name of the buyer.

After the survey was completed, Mr. Honse, Gary, and Wesley built a new fence on the western side of the disputed property that followed the property line as indicated in the survey. Mr. Honse estimated that the fence was built "a couple months after the survey was done." Mr. Honse said that the Shanks had no conversations with him about the installation of the new fence and never told him to stop building it. Mr. Shanks saw "the Honses" building the new fence on the west side of the disputed property.

*The Initial and Amended Judgments*

The trial court entered its initial judgment on May 11, 2011. Mr. Honse filed a "motion to correct and amend judgment" because the "Exhibit 1" referenced in the judgment—which apparently described the property affected thereby—had not actually been included in the judgment. As earlier noted, the trial court subsequently entered an amended judgment that quieted title to the disputed property in the name of Mr. Honse; the disputed property was more fully described as follows:

All that part of the East Half of the Southeast Quarter lying West of the East bank of the branch and all that part of the Southeast Quarter lying

West of 10 feet East of the East bank of the branch, all being in Section 32, Township 41 North of Range 8 West of the 5th P.M. Containing approximately 2.32 acres per survey of Osage County Land Survey, LLC, Survey # 2007–117. The amended judgment also stated that "[t]he parties stipulated, prior to trial, that although said legal description indicated 2.32 acres it actually consisted of 2.23 acres."

Within the amended judgment's extensive findings of fact and conclusions of law, the trial court observed that because "[Mrs.] Shanks did not allege any cause of action for title to the [d]isputed [p]roperty under color of title and/or any claim for reformation of the Shanks' [d]eeds, [Mrs.] Shanks must satisfy all elements of her claim to quiet title to the [d]isputed [p]roperty by adverse possession." The trial court found that Mrs. Shanks failed to do so in that she failed to prove that the Shanks' possession was: 1) open and notorious; 2) actual; and 3) hostile.[8]

The trial court found that Mrs. Shanks "offered no evidence that [the Shanks] possessed and occupied the entire area of the [d]isputed [p]roperty other than their cattle grazed in the [d]isputed [p]roperty or that they ran machinery in the [d]isputed [p]roperty on a sporadic basis."[9] The trial court concluded that Mr. Honse "ha[d] superior title and claim to the [d]isputed [p]roperty as compared to [Mrs.] Shanks, and is entitled to fully and peacefully enjoy and make whatever use of the Honse property, in its entirety, as he deems desirable and within the confines of the law."

**Analysis**

Mrs. Shanks contests each of the trial court's three grounds for finding that the Shanks had failed to prove their adverse possession claim, claiming each was not supported by substantial evidence.[10] Because Mrs. Shanks' failure to prove any one of the necessary elements of her claim would require us to affirm the trial court's judgment, we address only her first point. *See Murphy*, 289 S.W.3d at 237, 240.

*Point I—Actual Possession*

■ Mrs. Shanks' first point contends the trial court erred in finding that she failed to prove actual possession "because [she] offered substantial evidence proving [that the Shanks] controlled the disputed property and intended to exclude others from such control in that [the Shanks] occupied, cleared, pastured, and erected and maintained fences for a continuous period of time beginning in 1963." We deny the point because the trial court was not required to believe the referenced evidence.

■ "Actual possession is the present ability to control the land and the intent to exclude others from such control." *Martens v. White*, 195 S.W.3d 548, 554 (Mo. App. S.D.2006). "Whether an act constitutes actual possession 'depend[s] on the nature and location of the property, the uses to which it can be applied and all the facts and circumstances of a particular case.'" *Watson*, 298 S.W.3d at 526–27 (quoting *Murphy*, 289 S.W.3d at 237). *Watson* goes on to state that actual possession "is less strict for wild, undeveloped land." 298 S.W.3d at 527.

8. Such a finding necessarily precluded the Shanks' ejectment and trespass claims. Mrs. Shanks has not appealed the portions of the judgment that awarded relief to Mr. Honse.

9. We note that the trial court used the word "offered" in connection with the referenced evidence; it did not use terms like "proved"

or "established"—terms that might have indicated that the trial court further found the offered evidence to be true.

10. Mrs. Shanks made clear at oral argument that she did not intend her assertion to include an against-the-weight-of-the-evidence challenge.

The trial court cited *Shuffit v. Wade*, 13 S.W.3d 329, 335 (Mo.App. S.D.2000), for the proposition that a claimant to land "without color of title" "must show *physical possession* of the *entire area* claimed[,]" and went on to find that the Shanks "[had] not fully occupied the [d]isputed [p]roperty[.]" (Emphasis as supplied by the trial court.) The trial court further stated:

> The mere fact that fences have existed in and around the [d]isputed [p]roperty prior to [Mr.] Honse's ownership of the Honse property does not establish actual use. *See, Edmonds[ v. Thurman]*, 808 S.W.2d [408], 411 [ (Mo.App.S.D.1991) ]. Allowing cattle to graze on the [d]isputed [p]roperty is not substantial evidence to establish title by adverse possession, and merely constitutes nothing more than occasional trespasses.

Mrs. Shanks does not challenge the trial court's statement of the law, and she acknowledges, consistent with *Teson v. Vasquez*, 561 S.W.2d 119 (Mo.App.St.L.D. 1977), that she had the burden of "show[ing] physical possession of the entire area claimed." *Id.* at 126. Despite these concessions, she then proceeds to argue her point based on testimony favorable to her position but unfavorable to the judgment. We cannot adopt Mrs. Shanks' perspective as we must "defer to the trial court's credibility determinations and view the evidence and permissible inferences in the light most favorable to the judgment, disregarding all contrary evidence and inferences." *Bowles*, 217 S.W.3d at 404. Our role is not to reevaluate the believability or weight of the contested evidence, *White*, 321 S.W.3d at 308–09, and Mr. Honse, who was familiar with the disputed property even before he owned it, contested at trial any continuous use by the Shanks of the disputed property.

The instant case is comparable to a case cited by Mrs. Shanks in which the Western District reversed a judgment ordering title by adverse possession. In so holding, the court noted that

> [a]llowing cattle to graze on the disputed parcel, repairing the old wire fence constructed by a predecessor, constructing and using a makeshift pallet fence on a small portion of the disputed parcel for corralling livestock, and giving permission to others to hunt and occasionally remove hay from the property is not substantial evidence to establish title by adverse possession.

*Id.* at 240.

As in *Murphy*, the evidence favorable to the judgment indicated that the Shanks did nothing more than put their cattle on the disputed property, occasionally checked on them using a four-wheeler, and helped to maintain the fencing. When he heard that the Shanks intended to remove timber from the disputed property, Mr. Honse called Mr. Shanks to tell him not to do it. Then, after the timber was removed, Mr. Honse and his brothers installed a new fence along the actual property line as shown on the survey they had acquired. Despite the delay in marking the actual boundary line with a fence, Mr. Honse and his "predecessors did not give up title by not placing the fence on their boundary line." *Harris*, 940 S.W.2d at 46.

Point I fails. Points II and III are denied as moot, and the judgment of the trial court is affirmed.

RAHMEYER, and LYNCH, JJ., Concur.